1    RONALD L. OLSON (SBN 044597)
     Ron.Olson@mto.com
2    KELLY M. KLAUS (SBN 161091)
     Kelly.Klaus@mto.com
3    MUNGER, TOLLES & OLSON LLP
     355 South Grand Avenue, 35th Floor
4    Los Angeles, CA  90071-1560
     Telephone:  (213) 683-9100
5    Facsimile:   (213) 687-3702

6    CAROLYN HOECKER LUEDTKE (SBN 207976)
     Carolyn.Luedtke@mto.com
7    JONATHAN H. BLAVIN (SBN 230269)
     Jonathan.Blavin@mto.com
8    MARK R. CONRAD (SBN 255667)
     Mark.Conrad@mto.com
9    CAROLYN V. ZABRYCKI (SBN 263541)
     Carolyn.Zabrycki@mto.com
10   MUNGER, TOLLES & OLSON LLP
     560 Mission Street, 27th Floor
11   San Francisco, CA  94105
     Telephone:  (415) 512-4000
12   Facsimile:   (415) 512-4077

13
     ANDREW P. BRIDGES (SBN 122761)
14   abridges@winston.com
     JENNIFER A. GOLINVEAUX (SBN 203056)
15   jgolinveaux@winston.com
     WINSTON & STRAWN LLP
16   101 California Street
     San Francisco, CA  94111-5894
17   Telephone:  415-591-1000
     Facsimile:  415-591-1400

18
     Attorneys for Defendants
19   VOSTU USA, INC., VOSTU LLC and VOSTU LTD.

20                UNITED STATES DISTRICT COURT

21            NORTHERN DISTRICT OF CALIFORNIA

22                 SAN JOSE DIVISION

| | |
|---|---|
| 23   ZYNGA INC., a Delaware Corporation, | CASE NO.  CV  11-2959 EJD |
| 24         Plaintiff, | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF VOSTU'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER ENJOINING ZYNGA FROM PURSUING BRAZILIAN LITIGATION** |
| 25   v. | |
| 26   VOSTU USA, INC., a Delaware Corporation; VOSTU LLC, a Delaware Corporation; VOSTU LTD., a Cayman Islands | |
| 27   Corporations; and DOES 1-5 | |
| 28        Defendants. | |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ....................................................................................................... 1

II.   BACKGROUND ........................................................................................................ 6

    A.    The Parties to Both Lawsuits:  Zynga and Vostu.................................................. 6

    B.    Litigation in This Court....................................................................................... 8

    C.    The Brazil Litigation ......................................................................................... 9

III.  ARGUMENT ........................................................................................................... 12

    A.    The Parties and Issues Are the Same in the U.S. and Brazilian Actions, and the U.S. Action Is "Dispositive" of the Dispute in the Brazilian Action .............. 14

        1.    The Parties Are the "Same." .................................................................. 14

        2.    The Issues Are the "Same," and Resolution of the U.S. Action Will Be "Dispositive" of the Dispute in the Brazilian Action ......................... 15

    B.    The Continuation of the Brazilian Litigation Frustrates This Court's Jurisdiction ....................................................................................................... 21

    C.    The Impact on "Comity" Between the U.S. and Brazil Is "Tolerable.".............. 22

IV.   THE BOND FOR THIS ORDER SHOULD BE MINIMAL OR THERE SHOULD BE NO BOND REQUIRED AT ALL ............................................................ 24

V.    CONCLUSION ........................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Amaretto Ranch Breedables v. Ozimals, Inc.*,
No. C-10-05696, 2010 WL 5387774 (N.D.Cal. Dec. 21, 2010).............................................. 19

*Apple Computer Inc. v. Microsoft Corp.*,
35 F.3d 1435 (9th Cir. 1994).............................................................................................. 2, 19

*Applied Medical Distribution Corp. v. Surgical Co. BV*,
587 F.3d 909 (9th Cir. 2009)............................................................................................. passim

*Aruba Hotel Enters. N.V. v. Belfonti*,
611 F. Supp. 2d 203 (D. Conn. 2009) ..................................................................................... 17

*AT&T Communications of California v. Pacific Bell*,
No. C 96-1691, 1996 WL 940836 (N.D. Cal. July 3, 1996) ................................................... 24

*Athina Invs. Ltd. v. Pinchuk*,
443 F. Supp. 2d 177 (D. Mass. 2006) ..................................................................................... 14

*Attwood v. Mendocino Coast Dist. Hosp.*,
886 F.2d 241 (9th Cir. 1989)................................................................................................... 22

*Bethell v. Peace*,
441 F.2d 495 (5th Cir. 1971)................................................................................................... 24

*Canon Latin Am., Inc. v. Lantech (CR), S.A.*,
453 F. Supp. 2d 1357 (S.D. Fla. 2006) .................................................................................. 15

*Computer Associates Int'l, Inc. v. Altai, Inc.*,
950 F.Supp. 48 (E.D.N.Y. 1996) ............................................................................................ 17

*E. & J. Gallo Winery v. Andina Licores S.A.*,
446 F.3d 984 (9th Cir. 2006)................................................................................................ passim

*E. & J. Gallo Winery v. Andina Licores S.A.*,
440 F. Supp. 2d 1134 (E.D. Cal. 2006).................................................................................. 13

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991) ........................................................................................................... 2, 18

*Ibeto Petrochemical Indus. Ltd. v. M/T Beffen*,
475 F.3d 56 (2d Cir. 2007)................................................................................................... 5, 21

*Ibeto Petrochemical Indus., Ltd. v. M/T Beffern*,
412 F. Supp. 2d 285 ................................................................................................................ 22

# TABLE OF AUTHORITIES
(continued)

Page(s)

*In re Icenhower,*
398 B.R. 902 (Bkrtcy. S.D. Cal. 2008) ........................................................... 12, 16

*In re Unterweser Reederi Gmbh,*
428 F.2d 888 (5th Cir. 1970)............................................................................... 23

*In re Vivendi Universal, S.A. Sec. Litig.,*
No. 02 Civ. 5571, 2009 WL 3859066 (S.D.N.Y. Nov. 19, 2009) .............................. 15, 16, 17

*Int'l Equity Invs., Inc. v. Opportunity Equity Partners Ltd.,*
441 F. Supp. 2d 552 (S.D.N.Y. 2006)................................................................. 14

*Kaepa, Inc. v. Achilles Corp.,*
76 F.3d 624 (5th Cir. 1996)................................................................................ 22

*Laker Airways Ltd. v. Sabena, Belgian World Airlines,*
731 F.2d 909 (D.C. Cir. 1984) ........................................................................... 24

*MasterCard Int'l. Inc. v. Argencard Sociedad Anonima,*
No. 01 CIV. 3027(JGK), 2002 WL 432379 (S.D.N.Y. Mar. 20, 2002) ......................... 15, 17

*Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.,*
369 F.3d 645 (2d Cir. 2004)............................................................................... 15

*Perfect 10, Inc. v. Amazon.com, Inc.,*
508 F.3d 1146 (9th Cir. 2007)............................................................................. 4

*Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren,*
361 F.3d 11 (1st Cir. 2004) ............................................................................... 24

*Seattle Totems Hockey Club, Inc. v. Nat'l Hockey League,*
652 F.2d 852 (9th Cir. 1981)............................................................... 12, 17, 23, 24

*SG Avipro Fin. Ltd. v. Cameroon Airlines,*
No. 05 Civ. 655, 2005 WL 1353955 (S.D.N.Y. June 8, 2005) ................................. 17

*Stein Associates, Inc. v. Heat and Control, Inc.,*
748 F.2d 653 (Fed. Cir. 1984)............................................................................. 17

*Stolt Tankers BV v. Allianz Seguros, S.A.,*
No. 11 Civ. 2331, 2011 WL 2436662 (S.D.N.Y. June 16, 2011) ..................................... 21, 22

*Storm LLC v. Telenor Mobile Commc'ns AS,*
No. 06 Civ. 13157, 2006 WL 3735657 (S.D.N.Y. Dec. 15, 2006)......................... 14

MEMO. ISO *EX PARTE* APP. FOR TRO
CASE NO. CV 11-2959 EJD

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page(s)**

3

*Suchodolski Assocs., Inc. v. Cardell Fin. Corp.*,

4

No. 03 Civ. 4148, 2006 WL 10886 (S.D.N.Y. Jan. 3, 2006) ................................................... 17

5

*Winter v. Natural Res. Def. Council, Inc.*,

555 U.S. 7 (2008) ....................................................................................................................... 13

6

*Zimnicki v. Neo-Neon Int'l, Ltd.*,

7

No. 06 C 4879, 2009 WL 2392065 (N.D. Ill. July 30, 2009) ................................................. 17

8

**FEDERAL STATUTES**

9

17 U.S.C. § 102(a) ............................................................................................................................. 18

10

17 U.S.C. § 102(b) ............................................................................................................................. 19

11

**FEDERAL RULES**

12

Fed. R. Civ. Proc. 65(c) .................................................................................................................... 24

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMO. ISO *EX PARTE* APP. FOR TRO
CASE NO. CV 11-2959 EJD

1    **I.      INTRODUCTION**

2           Vostu requests the Court's immediate assistance in preventing a grave injustice and a

3    threat to this Court's jurisdiction, which plaintiff, Zynga Inc., itself initially invoked to resolve the

4    parties' dispute.[1]  Within the last several days, Zynga commenced a virtually identical action,

5    seeking identical relief, for copyright infringement in Brazil.  The copyrights that Zynga's suit in

6    Brazil seeks to enforce are all copyrights that its suit here seeks to enforce.  All four of Vostu's

7    games that Zynga challenges in Brazil are games that Zynga challenges here.[2]

8           With no notice to Vostu, and without Vostu having an opportunity to be heard, Zynga

9    sought and obtained a preliminary injunction in Brazil directing Vostu to shut down four of its

10   popular online social games.  Vostu can only comply with the injunction Zynga obtained by

11   blocking games that reside on computer servers located in the United States.  If Zynga persists

12   with its Brazil litigation and forces Vostu to comply with that injunction, Vostu will be reduced to

13   a small fraction of its total operations.  The injunction in Brazil is scheduled to take effect this

14   Friday, August, 12.  Hence, Vostu must seek this Court's immediate intervention.  This Court has

15   ample authority to issue an anti-suit injunction, requiring Zynga to suspend its suit in Brazil and

16   proceed with this suit for alleged copyright infringement in all of the games it challenged both

17   here and in Brazil.  The Court should issue a TRO precluding Zynga from pursuing the Brazil

18   litigation and requiring Zynga to halt its injunction request in Brazil, and it should set the matter

19   down for a briefing on a preliminary injunction against Zynga's abusive prosecution of the

20   redundant Brazil suit.

21          The parties to this case (also parties to the new case in Brazil[3]) are fierce competitors in

22   the popular and growing market for "online social games" that are played on social networking

23

24   [1] Vostu refers to all three named and served defendants, Vostu USA, Inc., Vostu LLC, and Vostu,
     Ltd.  Vostu, LLC has never been served in this litigation.

25   [2] This suit includes an additional challenge to a Vostu game that Zynga did not include in the
26   Brazil suit..

27   [3] As discussed below, Zynga added a Vostu Brazilian entity, as well as Google's Brazilian
     subsidiary, to the complaint in Brazil.  The presence of Zynga as Plaintiff and Vostu as Defendant
28   in both cases satisfies the "same parties" requirement for an anti-suit injunction.

MEMO. ISO *EX PARTE* APP. FOR TRO
                                            CASE NO. CV 11-2959 EJD

1   platforms like Facebook.  Zynga first explored the possibility of eliminating Vostu as competition

2   over a year ago, when it initiated partnership discussions (that lasted for months) with Vostu.

3   Zynga did not say anything to Vostu about alleged infringement of its games during those

4   discussions.  On June 16, 2011, Zynga tried a different tack to eliminate competition from Vostu,

5   by filing its complaint for copyright infringement in this Court.  Zynga larded its complaint with

6   deceptive side-by-side "screen shots" of images from the two companies' online social games and

7   insisted that similarities between the two images necessarily resulted from Vostu's copying

8   Zynga's copyrighted expression.  Even before notifying Vostu, Zynga provided its pleadings to

9   press outlets, one of which reported that Zynga had declared, "WAR!  Zynga Sues the Hell Out of

10   Brazilian Clone Vostu."  TechCrunch, June 16, 2011, attached as Ex. B to Declaration of Carolyn

11   Hoecker Luedtke ("Luedtke Decl.").

12        What Zynga evidently did not expect is that Vostu would fight back vigorously and

13   defend itself in this Court.  On July 20, Vostu answered Zynga's complaint, and filed its own

14   counterclaims seeking a declaration that Vostu's games do not infringe Zynga's copyrights.

15   Vostu's counterclaims demonstrated that Zynga's side-by-side comparisons did not give the

16   Court the whole picture.  Vostu showed that element after element that Zynga featured in its

17   complaint existed in online games in similar game genres well before Zynga released its games.

18   The complete picture is damning to Zynga's claim of copyright infringement for two reasons.

19   First, the existence of the same elements in other games strongly suggests that Zynga copied

20   those elements from pre-existing games, something Zynga has a well-established reputation for

21   doing.  *See* Vostu's Answer & Counterclaims ("Answer") (Dkt. No. 18), Luedtke Decl., Ex. A.

22   Zynga cannot claim that it owns purportedly infringed elements that are not *original* to Zynga.

23   *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).  Second, the widespread

24   use of functional or stock elements for common genres—tables, customers, chefs and cookbooks

25   in "café" games; streets, plots of land, and hamburger-topped fast-food outlets in "city" games—

26   is proof that Zynga cannot enforce those elements against Vostu under the doctrines of

27   functionality and scènes à faire.  *See Apple Computer Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1446

28   (9th Cir. 1994).

MEMO. ISO *EX PARTE* APP. FOR TRO
CASE NO. CV 11-2959 EJD

1    If Zynga actually believed it had a meritorious claim based on slavish copying of

2   copyright-protected elements, one reasonably would have expected that it would move for a

3   preliminary injunction after filing its litigation here, as frequently happens in copyright cases and

4   as Zynga's U.S. attorneys initially suggested it would.  Zynga did not do that.  Zynga originally

5   said it wanted expedited discovery.  Vostu's counsel responded that it agreed and that the parties

6   should immediately exchange source code.  Zynga's counsel thereafter said that his client did not

7   even want expedited discovery, which would have allowed a prompt analysis of Zynga's claim.

8   Luedtke Decl., Ex. H.  Zynga thereafter indicated no interest in pursuing a preliminary injunction

9   motion here and instead was content to await discovery and active litigation in accordance with

10  the Rules, which would mean the soonest discovery would start would be this fall, around the

11  time of the first case management conference, on November 4.  Order Setting Initial Case

12  Management Conference and ADR Deadlines (Dkt. No. 4).

13    Unbeknownst to Vostu, Zynga actually was repackaging the same claims for a different

14  forum, Brazil.  Brazil regularly allows a plaintiff to get a preliminary injunction without affording

15  a defendant notice or an opportunity to be heard.  Social games are very popular in Brazil, and

16  Vostu is the market leader in that country.  Zynga attacked Vostu with a secret preliminary

17  injunction request last week with a court in Sao Paulo, Brazil.  On August 3, 2011, without any

18  notice to Vostu, without allowing a response, and without imposing an injunction bond, a court in

19  Sao Paolo granted Zynga's request for an injunction, and ordered Vostu to shut down four

20  games—all of which are already at issue in Zynga's complaint in this case

21    While Zynga never provided its complaint to Vostu—indeed, Zynga did not provide and

22  still has not provided Vostu with any of the papers on which it based its preliminary injunction

23  request—Zynga handily provided the complaint and notice of the Brazilian court's decision to the

24  same website that has previously announced Zynga's declaration of "WAR!"  *See* Luedtke Decl.,

25  Ex. C (TechCrunch, Aug. 3, 2011).  Zynga is thus treating its Brazil litigation as both a powerful

26  end-run around this court and as a vehicle for a publicity attack using a prominent technology

27  blog as its publicist.

28    Why does it matter, and why does Vostu need this Court's urgent attention?  Because

-3-

MEMO. ISO *EX PARTE* APP. FOR TRO
CASE NO. CV 11-2959 EJD

1    Zynga is improperly seeking in Brazil the preliminary injunction it decided not to seek here.  And

2    it is doing so by exploiting procedures there that allow secret injunctions, that allow Zynga to

3    avoid furnishing its moving papers to Vostu, that allow a catastrophic injunction without the

4    protection of a bond, and that sharply curtail discovery.  If Zynga had filed only in Brazil, it

5    would be a different matter.  But Zynga has now filed there redundantly after confronting a

6    powerful counterclaim for declaratory relief by Vostu that exposed the misleading allegations of

7    Zynga's complaint.  Taking into account all the circumstances, Zynga's conduct is an affront.

8           The threat to Vostu from Zynga continuing its Brazil suit and enforcing its injunction is

9    grave.  In the past, service interruptions of even a few days have lead to the loss of millions of

10   Vostu users.  Shutting those games down for the extended life of litigation and appeals in the

11   Brazilian legal system will mean the end of the games, the decimation of Vostu's Brazil user base

12   (by far the overwhelming majority of the company's users), and, much to Zynga's delight, the

13   elimination of the biggest obstacle to Zynga's domination of social gaming in Brazil.  Not

14   coincidentally, Zynga recently launched its games in Portuguese, and within the last month

15   increased its marketing in Brazil and released Brazil-themed promotions within its games.

16          Zynga's continued pursuit of its Brazilian litigation also will mean the usurpation of this

17   Court's jurisdiction.  Zynga's counsel has blithely claimed that the Brazil lawsuit is completely

18   independent of this case, and instead is about "Vostu's acts of infringement and unfair

19   competition in Brazil and the resulting harm to Zynga and unwitting Brazilian consumers."

20   Luedtke Decl., Ex. O.  That cannot be squared with Zynga's complaint, which charges Vostu with

21   violating Zynga's display rights; if that is infringement—and Vostu disputes it is—then that takes

22   place on computer servers *in the United States*.  *Perfect 10, Inc. v. Amazon.com, Inc*., 508 F.3d

23   1146, 1160 (9th Cir. 2007) (infringement of copyright owner's right to publicly display its works

24   takes place on computer servers that store and serve images to users). The damages and injunctive

25   relief that Zynga seeks in Brazil duplicate the relief Zynga seeks in this case.  But this Court's

26   jurisdiction to determine whether Zynga is entitled to this relief—jurisdiction that Zynga invoked

27   before turning to Brazil—will be overtaken and disposed of by the courts in Brazil.  Even

28   assuming the worst for Vostu, there is a serious risk of duplicative damages and inconsistent

-4-                          MEMO. ISO *EX PARTE* APP. FOR TRO
                             CASE NO. CV 11-2959 EJD

1    injunctions that would leave Vostu unable to satisfy both courts' requirements.

2         This Court has the well-established authority to preserve its primary jurisdiction over this

3    dispute and to issue an injunction to Zynga to halt its suit in Brazil.  "Such injunctions allow the

4    court to restrain a party subject to its jurisdiction from proceeding in a foreign court in

5    circumstances that are unjust."  *E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 989

6    (9th Cir. 2006) ("*Gallo*").  Vostu clearly satisfies all three requirements for an anti-suit injunction

7    under controlling Ninth Circuit authority in *Gallo* and *Applied Medical Distribution Corp. v.*

8    *Surgical Co. BV*, 587 F.3d 909, 915 (9th Cir. 2009):

9              (1)    The parties are the same, and the issues in this case are dispositive

10   of the action in Brazil.  *Applied Medical*, 587 F.3d at 915.  As explained in the

11   accompanying declaration of Professor Ronaldo Lemos, the head professor of

12   intellectual property law and director of the Center for Technology & Society at

13   the Fundação Getulio Vargas (FGV) Law School in Rio de Janeiro, Brazilian

14   copyright law follows United States copyright law on the dispositive issues of

15   originality, functionality, and scènes à faire.  Declaration of Ronaldo Lemos

16   ("Lemos Decl.") ¶¶ 15-22.  Zynga has conceded as much by drafting its Brazilian

17   complaint as a virtual answer to Vostu's counterclaim in this Court on the scènes à

18   faire doctrine.  *Id*. ¶¶ 13-14.  If Zynga wants to make those arguments, it can and

19   must do so in this Court.

20             (2)    Zynga's continued prosecution of the injunction proceedings will

21   "frustrate a policy of" this Court, *Gallo*, 446 F.3d at 991, namely, the interest of

22   the federal courts in "deterring forum shopping" and ensuring that "that

23   adjudication of the same issues in two separate actions [does not] result in

24   inconvenience, inconsistency, and a possible race to judgment."  *Ibeto*

25   *Petrochemical Indus. Ltd. v. M/T Beffen*, 475 F.3d 56 (2d Cir. 2007).

26             (3)    An anti-suit injunction directed to Zynga "would not have an

27   intolerable impact on comity."  *Applied Medical*, 587 F.3d at 919-20.  In fact, the

28   suit would have no effect on comity.  The injunction would respect the Courts in

MEMO. ISO *EX PARTE* APP. FOR TRO
CASE NO. CV 11-2959 EJD

1   both jurisdictions.  That is something that Zynga—which in essence has shopped

2   forums across borders—has not done and will not do unless restrained.

3       Time is of the essence.  If Zynga does not halt its prosecution of the Brazilian litigation

4   and injunction immediately, questions about this Court's jurisdiction will be academic.  There is

5   zero harm to Zynga from the issuance of a TRO granting an anti-suit injunction, to be followed

6   by prompt resolution of the matter on a preliminary injunction schedule.  Zynga waited for

7   months, and in some instances years, while users were playing Vostu's games and building their

8   assets within those games, and while it was courting Vostu's partnership, and it has been willing

9   to wait for nearly two months (and counting) without any request for this Court to issue an

10  injunction.  Zynga can certainly wait a few additional weeks for Vostu to receive some due

11  process when facing an injunction that effectively seeks a corporate death sentence.

12  **II.     BACKGROUND**

13      **A.     The Parties to Both Lawsuits:  Zynga and Vostu**

14      Zynga and Vostu are fierce competitors in the booming market for online social games.

15  Zynga is the biggest developer of online social games in the world, with more than 250 million

16  monthly active users.  Luedtke Decl., Ex. D.  Zynga has built its business by imitating the games

17  of its competitors.  Its business model has been described as follows: "Steal someone else's game.

18  Change its name.  Make millions.  Repeat."  Answer ¶ 6 & Ex. A at 1; *see also id.* ¶ 7 & Ex. A at

19  13 (quoting CEO Mark Pincus as having told Zynga employees, "You're not smarter than your

20  competitor.  Just copy what they do and do it until you get their numbers.").

21      Vostu also makes social games and is a threat to Zynga's global domination.  Vostu

22  creates social games in the Portuguese language.  It is the preeminent company with games in

23  Portuguese, which are played throughout the world, including in Portugal, Brazil, and the United

24  States.  Vostu's games are hosted on servers in the United States operated by Amazon; its games

25  are available to users around the world on Facebook and on Google's Orkut social platform; and

26  it has over 500 employees worldwide, including staff in Argentina, Brazil, and the United States.

27  Kafie Decl. ¶¶ 5-6.

28      Vostu launched its first product, an online soccer game called Joga Croque, more than two

MEMO. ISO *EX PARTE* APP. FOR TRO
CASE NO. CV 11-2959 EJD

1   years ago, in May 2009.  *Id.* ¶ 6.  Thereafter, Vostu launched a series of other successful games—

2   MiniFazenda in November 2009; Café Mania in June 2010; Vostu Poker in August 2010; Pet

3   Mania in October 2010; Mega City in April 2011.  *Id.*  Each of these games falls within a well-

4   established genre of online social games (farm, café, poker, pet, and city) in which many other

5   developers have produced games with similar features.  All of these games have been available

6   and widely popular with online social gamers—and even apparently popular enough to attract

7   Zynga's interest—for months, in most cases more than a year.

8        Vostu has enormous business momentum.  It now has more than 1.5 million monthly

9   active users, and in the last week alone, the company's games picked up more than 450,000

10  additional active monthly users.  Luedtke Decl., Ex. E.  Vostu presents a competitive threat to

11  Zynga because Vostu has quickly become the most prominent social game provider among a

12  segment of the market—namely, the rapidly-growing population of internet users in Brazil and

13  throughout South America—that Zynga has not been able to dominate.  In addition, as of May

14  2011, Vostu has made its games available to Facebook users, which threatens Zynga's dominance

15  on that social platform.  Kafie Decl. ¶ 6.

16       The parties were not strangers before this litigation started.  Zynga has tried for more than

17  a year to break into the Portuguese-language market for social gaming.  Beginning in August

18  2010, Zynga's business development team made several contacts with Vostu, to explore a

19  partnership.  *Id.* ¶¶ 21-24.  The parties continued to correspond, and even had executives meet in

20  person, in January 2011.  *Id.* ¶¶ 25-32.  Zynga obviously had reviewed Vostu's games and noticed

21  their popularity in Brazil.  But during months of discussion, Zynga said nothing about Vostu

22  copying or otherwise infringing any of Zynga's games.  *Id.* ¶¶ 24-27, 29.

23       Earlier this year, however, Zynga switched gears and launched a calculated campaign to

24  destroy its competitor.  First, Zynga launched all of its existing games in Portuguese.  *Id.* ¶¶ 15,

25  33.  Zynga then hired a former Vostu employee to run its newly launched Brazilian operations.

26  *Id.* ¶¶ 16, 33.  Around the same time, Zynga began marketing its games in Brazil.  *Id.* ¶¶ 17-18.

27  Then, Zynga filed this lawsuit and publicized it prominently.  *Id.* ¶ 34.  And, since this litigation

28  started, a recruiting firm, presumably acting at Zynga's behest, appears to be targeting key Vostu

                                    MEMO. ISO *EX PARTE* APP. FOR TRO
                                    CASE NO. CV 11-2959 EJD

1    employees, using the litigation to try to shake their confidence in, and loyalty to, Vostu.  *Id.* ¶ 19.

2    Then, a few weeks ago, Zynga launched Brazilian themed promotional items in its games.  *See*

3    Luedtke Decl., Ex. P.  Most recently, as discussed below, Zynga launched its litigation in Brazil.

4    All of this conduct, taken together, leaves a firm impression that Zynga is bent on destroying

5    Vostu as competition.

6         **B.      Litigation in This Court**

7         On June 16, 2011, Vostu learned that this suit had been filed through a prominent industry

8    website, TechCrunch.  Kafie Decl. ¶ 34.   Zynga provided its complaint and accompanying

9    exhibits to TechCrunch, along with a press release, and caused them to be posted online before

10   Vostu had access to the papers.  The TechCrunch website, having received a courtesy copy of the

11   pleadings from Zynga, ran a story with the headline "WAR!  Zynga Sues the Hell Out of

12   Brazilian Clone Vostu."  Luedtke Decl., Ex. B.

13        Soon after filing the Complaint, Zynga demanded access to Vostu's source code and

14   threatened to seek expedited discovery and a preliminary injunction.  Luedtke Decl., Ex. F.

15   Vostu responded with an offer for counsel to exchange their clients' source code, so that both

16   parties and their counsel could immediately evaluate Zynga's counsel's claims that Vostu had

17   copied Zynga's source code.  Zynga's attorneys then backed away from their initial demand for

18   source code and refused the exchange offer.  Luedtke Decl ¶¶ 10-13, Exs. G & H.  Vostu also

19   asked Zynga to identify any portions of the games at issue that it believed infringed Zynga's

20   copyrights, so that Vostu could consider Zynga's specific concerns and there could be an

21   expedited exchange of discovery prior to any preliminary injunction motion.  Zynga responded by

22   identifying one type of game it believed Vostu was developing, and said it would want to seek an

23   injunction against that game, following expedited discovery.  Vostu then explained that it was not

24   developing a game in the genre described by Zynga.  Luedtke Decl., Ex. H.  Vostu's counsel

25   stressed that Vostu wanted an immediate exchange of source code in expedited discovery if

26   Zynga were to seek a preliminary injunction.  Zynga's counsel later notified Vostu's counsel that

27   Zynga did not wish to take any expedited discovery in this litigation and thus implied that it

28   would not seek any preliminary injunction here.  Luedtke Decl., ¶¶ 10-13 & Exs. G-H.  Vostu's

MEMO. ISO *EX PARTE* APP. FOR TRO
CASE NO. CV 11-2959 EJD

1   counsel continued to reach out to Zynga to see what could be done to move the litigation along

2   here, specifically including an early mutual exchange of source code for comparison.  Zynga's

3   counsel did not respond.  *See id.* ¶ 14.

4         Vostu then responded forcefully to Zynga's complaint.  It filed a 59-page answer and

5   counterclaim seeking a declaration of non-infringement on the ground that "the features and

6   elements that Zynga seeks to enforce are not Zynga's original creations" and are not "enforceable

7   against others."  Answer ¶¶ 143-349 (Luedtke Decl. Ex. A).  Whereas Zynga's widely-broadcast

8   claims of copyright infringement rested entirely on misleading screenshots, which Zynga had

9   carefully selected and cropped to create the illusion of copying, Vostu's counterclaim put these

10  images in perspective, demonstrating that the supposedly "copyrighted" elements on which

11  Zynga bases its lawsuit are, in truth, virtually identical to the elements of numerous other social

12  games, including many that *preceded* Zynga's supposed original creations.

13        Vostu's counterclaim described in graphic detail how Zynga had developed its own games

14  by copying features that other companies had pioneered.  The counterclaim showed how the

15  "copyrighted" image in Zynga's complaint regarding its city-building game in fact looked like six

16  other online games in this genre, including three that pre-dated Zynga's CityVille.  *Id.* ¶¶ 15-20,

17  225-268.  The counterclaim likewise demonstrated that Zynga itself had appropriated wholesale

18  the gameplay of a competitor's product when Zynga launched Café World, one of the games on

19  which Zynga bases its claims.  *Id.* ¶¶ 149-224.  The counterclaim thus demonstrated how the

20  images claimed by Zynga as its "intellectual property" are in fact nothing more than a collection

21  of unprotectable stock elements and *scènes-a-faire*, which game developers have used in these

22  genres for years, if not decades.  *See also id.* ¶¶ 269-305 (farm games); *id.* ¶¶ 306-322 (pet-care

23  games); *id.* ¶¶ 323-332 (poker games).

24        **C.     The Brazil Litigation**

25        Obviously chagrined by Vostu's robust defense in this litigation, where defendants gain a

26  hearing before the court imposes drastic relief, where the parties get real discovery, and where

27  courts protect enjoined parties with injunction bonds, Zynga went forum shopping.  Last week, it

28  sought an injunction in Brazil, where judicial procedures allowed it to present its papers and

1    argument *ex parte*, without notice to Vostu, and where there is only very restricted discovery at

2    any point in a case.  Zynga also added additional entities as defendants—including Vostu's

3    Brazilian subsidiary, which has marketing operations, and Google's Brazilian subsidiary, whose

4    social-networking platform popular in the Portuguese language, Orkut, hosts Vostu's games—but

5    Zynga's claims against these entities in Brazil are derivative of, inseparable from, and dependent

6    on the underlying copyright claims it asserts in this Court.  *See* Luedtke Decl., Exs. I & J.  In its

7    Brazil submissions, Zynga presented a different, but similarly misleading, collection of images

8    from games on which it had already based its complaint in this Court, coupled with the testimony

9    of multiple expert witnesses who said they had reviewed a selected set of "images" of Zynga's

10   and Vostu's games and concluded that such images were not "stock" images and that Vostu was

11   therefore guilty of infringement.  *Id.*  Zynga drafted its complaint in Brazil to steer around the

12   embarrassing details of Vostu's counterclaims before this Court, and to take advantage of a sneak

13   attack in Brazil that would offer Vostu no pre-injunction opportunity to respond there as it had

14   responded in this Court.

15         On the basis of papers that Zynga did not provide and has not provided to counsel, and

16   without a transcript to record what Zynga's Brazilian counsel said during an ex parte meeting

17   with the judge, Zynga obtained an injunction from the Brazilian court with no injunction bond.[4]

18   Vostu had no pre-injunction opportunity to present argument or evidence of its own.  Luedtke

19   Decl., Exs. K & L; Declaration of Raphael Nehin Correa ("Correa Decl.") ¶¶ 3-4, 8.   The

20   injunction purported to require Vostu to take its games offline on Friday, August 5.  Luedtke

21   Decl., Exs. K & L.  Under the injunction, Vostu is subject to a daily fine equivalent to $13,000

22   (US) as long as its games remain online.  *Id.*  Vostu's counsel was able to obtain a postponement

23   of the effective date of this injunction to this Friday, August 12, 2011.  Luedtke Decl., Exs. M &

24   N.  Vostu intends to file an appeal of the injunction before an appellate court in Sao Paulo.

25   However, if the injunction goes into effect on Friday, Vostu's games will be enjoined by the

26   Brazilian court.   Luedtke Decl., Exs. M & N.

27   _____

28   [4] Zynga did have to provide the usual bond that is required for a foreign plaintiff to file a lawsuit
     in Brazil.

1    In Brazil, Zynga did not submit any of the numerous expert declaration cited in its
2    preliminary injunction motion to the court nor has Zynga made any of that evidence—if it
3    exists—available to Vostu's counsel in Brazil. *See* Correa Decl. ¶ 6. This is highly unusual even
4    in Brazil. *See id.* ¶ 7. As a result, the court in Brazil decided a motion for preliminary injunction
5    without the submission of any evidence. Further, Zynga did not provide even a copy of its secret
6    Brazilian motion for preliminary injunction to Vostu. However, even though Zynga did not see
7    fit to serve Vostu or its attorneys with the pleadings or supporting declarations in the Brazilian
8    case, Zynga did provide a copy of the Portuguese motion for preliminary injunction to the
9    TechCrunch website, along with along with an English translation of the Brazilian preliminary
10   injunction order (just as Zynga had provided TechCrunch with a pre-filing copy of its complaint
11   in this Court). Luedtke Decl. ¶¶ 4-5 & Exs. B-C. To this day, Zynga has not served the
12   preliminary injunction motion or the declarations Zynga says supports it on Vostu in Brazil.
13   Correa Decl. ¶ 6. After the injunction had already issued, Vostu's attorneys in this case requested
14   a courtesy copy of the papers from Zynga's U.S. counsel; counsel refused to provide the papers
15   unless Vostu's U.S. counsel consented to accept Brazilian service of process. Luedtke Decl. ¶ 19
16   & Ex. O.

17   If not dissolved or suspended, the injunction issued by the Brazilian trial court will have a
18   crippling, if not lethal, effect on Vostu's business. Every day, 150,000 new users who would
19   have registered to play a Vostu game will be unable to do so. Kafie Decl. ¶ 10. The more than 6
20   million users who play Vostu's games—on average, 7 out of every 10 days—will be unable to
21   access these games at all. *Id.* They will lose access to virtual assets they have accumulated over
22   the course of their game play until now. *Id.* ¶ 14. Vostu estimates that if the injunction is in place
23   for seven days, it will permanently lose 75% of its users for the games at issue, and the games at
24   issue make up the vast majority of Vostu's users. *See id.* ¶¶ 12-13.

25   There is hard evidence these users will leave Vostu's platform and will not return—the
26   non-judicial outcome that Zynga earnestly wants, without an injunction bond protecting Vostu, in
27   its quest to dominate the Brazilian marketplace. In April 2010, Vostu's servers went down
28   because of a technical problem at Amazon and its games were offline for a period of between

MEMO. ISO *EX PARTE* APP. FOR TRO
CASE NO. CV 11-2959 EJD

1    several hours and two days.  For the games that were unavailable for that short period of just

2    days, Vostu estimates that between 15 and 20 percent of their users were permanently lost.  *Id.*

3    ¶ 12.  For some of these games, the decimated user has base never returned to the record-high

4    number of pre-outage users.  *Id.* ¶ 13.

5         These losses are certain to occur because daily users of social games do not remain idle

6    for long.  There are a plethora of competing products on the market, and other companies in this

7    fiercely competitive space offer games with similar features and themes.  Not coincidentally, in

8    the weeks before springing its Brazilian trap, Zynga increased its efforts to attract users to its own

9    games in Brazil.  Leading up to the secret injunction, Zynga launched a variety of special Brazil

10   focused promotional items in its games.  *See* Luedtke Decl. ¶ 20 & Ex. P (displaying special

11   Brazil-focused game items appearing in Zynga's games on and around July 21-22, 2011).  In

12   addition, Zynga's marketing efforts for its games within Brazil visibly increased.  *See* Kafie Decl.

13   ¶¶ 15-18.  If Zynga succeeds in shutting down the most popular online social games in Brazil—

14   Vostu's games—the market will be primed for those 35 million registered users that are displaced

15   to turn instead to Zynga's games, which heretofore had not gained market traction in Brazil.

16   **III.   ARGUMENT**

17        The Court "derive[s] the ability to enter an anti-suit injunction" from its "equitable

18   powers.  Such injunctions allow the court to restrain a party subject to its jurisdiction from

19   proceeding in a foreign court in circumstances that are unjust."  *Gallo*, 446 F.3d at 989.[5]  The

20   "injunction operates *in personam*: the American court enjoins *the claimant*, not the foreign court."

21   *Gallo*, 446 F.3d at 989 (emphasis added).  Although the power to issue an anti-suit injunction is

22   one that "should be used sparingly," the Court "*ha[s] a duty* to protect" its "legitimately

23   conferred jurisdiction to the extent necessary to provide full justice to litigants."  *Id.* at 989, 995

24   (emphasis added).

25   [5] *See also, e.g., Seattle Totems Hockey Club, Inc. v. Nat'l Hockey League*, 652 F.2d 852, 855 (9th
     Cir. 1981) (a "federal district court with jurisdiction over the parties has the power to enjoin them
26   from proceeding with an action in the courts of a foreign country"); *In re Icenhower*, 398 B.R.
     902, 910-11 (Bkrtcy. S.D. Cal. 2008) ("It is well established among the courts of appeals that
27   federal courts have the power in appropriate cases to enjoin foreign suits by persons subject to
     federal court jurisdiction.").
28

1    Requests for injunctive relief traditionally are evaluated under the four-part test articulated

2    by the Supreme Court in *Winter v. Natural Resourced Defense Council, Inc.*, 555 U.S. 7 (2008).

3    The request for an anti-suit injunction is evaluated under a different standard, although one that is

4    fully consistent with *Winter*.  In particular, Vostu need not demonstrate that it is likely to succeed

5    on the merits of its counterclaim, because the purpose of an anti-suit injunction is not to obtain

6    relief on the merits but to ask the Court to order the opposing party to halt its foreign litigation.

7    Ninth Circuit law is clear that Vostu need "only demonstrate that the factors specific to an anti-

8    suit injunction weigh in favor of granting the injunction."  *Gallo*, 446 F.3d at 991.  *See also E. &*

9    *J. Gallo Winery v. Andina Licores S.A.*, 440 F. Supp. 2d 1134, 1137-38 (E.D. Cal. 2006) ("As the

10   Ninth Circuit pointed out in *Gallo*, where the issue is one of anti-suit injunction, the applicant

11   need not meet the normal test for the granting of a preliminary injunction; that is, the likelihood

12   of success on the merits.  Rather, the applicant 'need only demonstrate that the factors specific to

13   an anti-suit injunction weigh in favor of granting the injunction.'").

14   Under Ninth Circuit law, there are three requirements for an anti-suit injunction:  (1) that

15   "the parties and the issues are the same," and that "the first action is dispositive of the action to be

16   enjoined"; (2) that the foreign litigation would "frustrate a policy of" the Court issuing the anti-

17   suit injunction; and (3) that "the impact on comity" from issuing an injunction "would be

18   tolerable."  *Applied Med. Distrib. Corp. v. Surgical Co. BV*, 587 F.3d 909, 913 (9th Cir. 2009)

19   (quoting *Gallo*, 446 F.3d at 991, 994).  Vostu readily satisfies each of these criteria.

20   *Winter's* requirement that the moving party be at risk of irreparable harm to obtain an

21   injunction, 555 U.S. at 22-23, is fully consistent with the above standard and satisfied on the facts

22   of this case.  The irreparable harm to Vostu in the absence of an injunction is clear:  if Zynga

23   continues its proceedings in Brazil and is able to enforce its injunction there, that threatens to end

24   or seriously debilitate Vostu as a going concern.  Moreover, Zynga's Brazil action irreparably

25   undermines this Court's jurisdiction to resolve the case that Zynga started, and as to which Vostu

26   has joined issue with its powerful and meritorious counterclaims.  Zynga now has no power to

27   avoid the case in the United States by voluntarily dismissing its action here, because Vostu's

28   counterclaim would survive.  Instead, Zynga is using the Brazil action to kill off Vostu and to

MEMO. ISO *EX PARTE* APP. FOR TRO
CASE NO. CV 11-2959 EJD

1  make this case effectively moot.

2     **A.     The Parties and Issues Are the Same in the U.S. and Brazilian Actions, and**
3          **the U.S. Action Is "Dispositive" of the Dispute in the Brazilian Action.**

4          The "first step" in "deciding if an anti-suit injunction is appropriate is determining

5  'whether or not the parties and the issues are the same, and whether or not the first action is

6  dispositive of the action to be enjoined.'" *Applied Medical,* 587 F.3d at 915 (quoting *Gallo*, 446

7  F.3d at 991). This condition is plainly met here.

8          **1.     The Parties Are the "Same."**

9          The parties are the "same" between the U.S. and Brazilian actions. As courts have made

10 clear, this requirement does not mean that the parties must be "identical," but only that they are

11 "affiliated or substantially similar, such that their interests are represented by one another." *Int'l*

12 *Equity Invs., Inc. v. Opportunity Equity Partners Ltd.*, 441 F. Supp. 2d 552, 562 (S.D.N.Y. 2006).

13 *See also Storm LLC v. Telenor Mobile Commc'ns AS*, No. 06 Civ. 13157, 2006 WL 3735657, at

14 *6 (S.D.N.Y. Dec. 15, 2006) ("Although Alpren is a participant in the Ukrainian litigation,

15 Alpren is not merely a shareholder of Storm but is part of a family of affiliated corporations that

16 collectively owns the entirety of Storm. The real parties in interest in the Ukrainian lawsuit are

17 essentially the same entities that are involved in the arbitration here."). *See also Athina Invs. Ltd.*

18 *v. Pinchuk*, 443 F. Supp. 2d 177, 180-81 (D. Mass. 2006) ("perfect identity of parties is not

19 necessarily required to meet the threshold inquiry").

20         Here, the parties are clearly "affiliated or substantially similar, such that their interests are

21 represented by one another." Zynga's complaint in this Court names Vostu, Ltd., Vostu USA,

22 Inc., Vostu LLC, and Vostu, LLC as defendants. Zynga's Brazilian complaint names Vostu, Ltd.,

23 Vostu USA, Inc., and Vostu Participações do Brasil Ltda. as defendants. Vostu, Ltd. is the parent

24 corporation of Vostu, USA Inc., as well as Vostu LLC, which are both U.S.-based subsidiaries.

25 *See* Kafie Decl. ¶¶ 2-4. Vostu Participações do Brasil Ltda., named in the Brazilian action but not

26 the U.S. action, is wholly owned by Daniel Kafie, chief executive officer of Vostu, Ltd., who

27 owns it in trust for Vostu, Ltd. *Id.* Furthermore, Vostu, LLC, named only in the U.S. action,

28 transferred all of its assets to Vostu LLC, a subsidiary of Vostu, Ltd., and is an entity that does

MEMO. ISO *EX PARTE* APP. FOR TRO
CASE NO. CV 11-2959 EJD

1    not serve any role in Vostu's operations.  *See id.*

2            The fact that Zynga's complaint in Brazil lists *additional* parties in the foreign suit—

3    namely, Google's Brazilian subsidiary—does not change the core identity of the parties.  *See,*

4    *e.g., Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc*., 369 F.3d

5    645, 652-53 (2d Cir. 2004) (fact that a different party was present in foreign proceedings did not

6    defeat "same parties" requirement, because purportedly distinct party was close affiliate of one of

7    the parties in the New York action, and was involved only because of affiliation; holding that

8    "parties to the two actions are thus sufficiently similar to satisfy the first threshold requirement");

9    *In re Vivendi Universal, S.A. Sec. Litig.*, No. 02 Civ. 5571, 2009 WL 3859066, at *5 (S.D.N.Y.

10   Nov. 19, 2009) ("substantial identity of the parties" where domestic action "includes two

11   individual defendants" and an "undeterminable number of other class members who are not

12   present in the Paris Action"); *Canon Latin Am., Inc. v. Lantech (CR), S.A.*, 453 F. Supp. 2d 1357,

13   1365 (S.D. Fla. 2006) (requirement met where "the parties were substantially similar," or where

14   the "primary parties" are the same; noting that "although SB Technology is an additional party

15   named in the Costa Rica action, there are no independent claims made against it"); *MasterCard*

16   *Int'l. Inc. v. Argencard Sociedad Anonima*, No. 01 CIV. 3027(JGK), 2002 WL 432379, at *10

17   (S.D.N.Y. Mar. 20, 2002) (holding identity of party requirement satisfied despite intervention of

18   an additional party in foreign proceeding since party was not a necessary party to the action).

19   Google is a defendant in Brazil solely because Vostu's games run on Google's "Orkut" social

20   networking platform in Brazil.  Zynga's Brazil complaint alleges that, under Brazilian law, Zynga

21   must name Google as a defendant, since the requested injunction would disrupt the display of

22   Vostu's games through Google's Orkut service.  Brazilian Complaint ¶ 22 & n.14.  But any

23   disruption to Google's service is entirely derivative of Zynga's claims against Vostu, and

24   Google's presence in the Brazilian caption does not change the fact the parties are the same.

25                  **2.      The Issues Are the "Same," and Resolution of the U.S. Action Will Be**
                    **"Dispositive" of the Dispute in the Brazilian Action.**
26

27           "In cases like this where the parties are the same, whether the issues are the same and the

28   first action dispositive of the action to be enjoined are interrelated requirements," i.e., to "the

1    extent the domestic action is capable of disposing of all the issues in the foreign action," the

2    "issues are meaningfully 'the same.'"  *Applied Medical,* 587 F.3d at 915.  The issues between this

3    action and the Brazilian action are the same, and this Court's resolution of Zynga's claims will be

4    dispositive of the Brazilian action.

5           Although the U.S. and the Brazilian actions are brought under each country's respective

6    copyright statutes, "local and foreign issues" may be "functionally the same . . . even though the

7    foreign action asserted claims under a foreign statute."  *Id.* at 918 (the "issues are not different

8    here merely because Surgical framed its Belgian action in terms of the Belgian Act").  The "Ninth

9    Circuit does not require foreign claims to be identical in form to the local claims."  *Id.  See also*

10   *Gallo*, 446 F.3d at 991 (holding that two actions involved the "same claims" because the

11   substance of defendant's Ecuadorian court action for statutory violation was breach of contract,

12   and the substance of plaintiff's claim in the U.S. action was for, among other things, a declaration

13   that plaintiff did not breach the contract); *In re Icenhower*, 398 B.R. at 912 ("In the Ninth Circuit,

14   this requirement is met if . . .  the substance of both actions is the same claim even though the

15   foreign action involves a claim for violation of a foreign statute.").  Nor does it matter if "not all

16   of the issues are identical," as long as the resolution of both actions "depend[]" upon the same

17   legal issues.  *Applied Medical,* 587 F.3d at 915 ("it was irrelevant in [*Gallo*] that the Ecuadorian

18   suit was under an Ecuadorian decree whereas the domestic action was based on California law,

19   because both clearly depended upon the same alleged violation of a distribution agreement";

20   "proper question" not whether issues "identical" but whether "same" in a "functional sense").

21          Moreover, the "dispositive" test does not formalistically require that the U.S. action

22   actually "dispose" of the foreign action.  "Technically speaking, no action by a United States

23   court can ever be dispositive of a foreign court's decision because that court's determination

24   about whether to give res judicata effect to a U.S. judgment is governed by comity principles,

25   which always give a foreign court discretion to determine whether to enforce a U.S. judgment

26   (absent a treaty stating otherwise)."  *In re Vivendi Universal*, 2009 WL 3859066, at *6.

27   Accordingly, in deciding whether the U.S. action will "dispose" of the foreign action, courts

28   "have focused on whether the substance of the claims and arguments raised in the two actions is

                                              -16-            MEMO. ISO *EX PARTE* APP. FOR TRO
                                                             CASE NO. CV 11-2959 EJD

1   the same." *Id. See also, e.g., Suchodolski Assocs., Inc. v. Cardell Fin. Corp.*, No. 03 Civ. 4148,

2   2006 WL 10886, at *3 (S.D.N.Y. Jan. 3, 2006) (domestic action "dispositive" of similar claims in

3   Brazil even though the former were asserted under New York law and the latter under Brazilian

4   law because the Brazilian complaint "touched matters" covered by U.S. decision); *SG Avipro Fin.*

5   *Ltd. v. Cameroon Airlines*, No. 05 Civ. 655, 2005 WL 1353955, at *3 (S.D.N.Y. June 8, 2005)

6   ("Irrespective of choice of law, the parties' dispute as to the validity of the June 25, 2002, Finance

7   Lease Agreement has been placed before the courts in both the domestic and foreign forums.");

8   *Aruba Hotel Enters. N.V. v. Belfonti*, 611 F. Supp. 2d 203, 215 (D. Conn. 2009) (dispositiveness

9   requirement was met where the "cases involve the same transactions and the issues are the

10  same"); *MasterCard*, 2002 WL 432379, at *10 (dispositiveness requirement met where

11  "MasterCard seeks in part a declaration under the License Agreement that it may revoke

12  Argencard's exclusivity, which is precisely the main issue raised by Argencard in the Argentine

13  action"). As the Ninth Circuit has held, anti-suit injunctions are warranted where "[a]djudicating"

14  the same "issue in two separate actions is likely to result in unnecessary delay and substantial

15  inconvenience and expense to the parties and witnesses," and "could result in inconsistent rulings

16  or even a race to judgment." *Seattle Totems*, 652 F.2d at 856.

17      This action is "dispositive" of the dispute in the Brazilian action because U.S. and

18  Brazilian copyright law are substantially similar on the critical legal issues which will dictate the

19  outcome of both cases. *See* Lemos Decl. ¶¶ 15-22. *See also e.g., Zimnicki v. Neo-Neon Int'l,*

20  *Ltd.*, No. 06 C 4879, 2009 WL 2392065, at *3 (N.D. Ill. July 30, 2009) (to establish

21  "dispositiveness" must "present[] the Court with evidence that the Chinese intellectual property

22  laws applicable to Neo-Neon's declaratory judgment action are the same or similar to the

23  provisions of the Copyright Act").[6]

24  _____

25  [6] Some courts have declined anti-suit injunctions in intellectual property cases, because different countries have different intellectual property regimes. The courts in such cases, however, have

26  emphasized that the substantive law concerning such rights *is different*. *See Computer Assoc. Int'l, Inc. v. Altai, Inc.,* 950 F.Supp. 48, 54 (E.D.N.Y. 1996), *aff'd*, F.3d 365, 371-72 (2d. Cir.

27  1997) ("the Court finds that the U.S. action cannot be deemed dispositive of Plaintiff's French [copyright] action as the latter action involves issues that *were neither raised*, *nor could have*

28  *been raised*, in the U.S. action" (emphasis added)); *Stein Assocs., Inc. v. Heat & Control, Inc.,*

MEMO. ISO *EX PARTE* APP. FOR TRO
CASE NO. CV 11-2959 EJD

First, under both U.S. and Brazilian copyright law, if Zynga itself copied from *pre-existing* games the elements of Zynga games that it complains Vostu copied, then Zynga cannot satisfy the threshold requirement of establishing that the purportedly infringed elements are *original* to Zynga.  *See* Lemos Decl. ¶¶ 15-19.  The U.S. Copyright Act protects "*original* works of authorship."  17 U.S.C. § 102(a) (emphasis added).  As the U.S. Supreme Court held in *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 347 (1991), "originality" is "the touchstone of copyright protection."  Similarly, Brazilian copyright law requires that a work "contain[] a minimal originality" to "deserve[] protection under the Brazilian Copyright Law." Lemos Decl. ¶ 16.  As the Brazilian Superior Court of Justice (Brazil's highest non-constitutional court) has held, to constitute an "original and protected work under copyright law," the work must "deriv[e] from a man's intellectual production, created by exercising such intellect," and must "demand[] effort and imagination."  *Id*.  The São Paulo Court of Appeals, which has jurisdiction to review the decisions issued by the court where Zynga's case in Brazil is currently pending, has stated that "there must be originality in the work, in other words it must be made up of components that individualize it, in such a way as not to be confused with another preexisting work."  *Id*. ¶ 17.  Indeed, Zynga acknowledges that its copyright interests under Brazilian law are essentially identical to its copyright interests under U.S. law, referencing in its Brazilian complaint Zynga's U.S. copyright registration certificates for the games at issue in both actions. *See* Luetdke Decl., Ex. J ¶ 28 ("The copyright established by law 9.610/98 is independent of registry, but the certificates issued by the North American Copyright Office proves the ownership of ZYNGA" of "rights of ZYNGA over the games that were copied by VOSTU, which are 'CityVille', 'Cafe World', 'PetVille', and 'ZYNGA Poker.'").

Second, under both U.S. and Brazilian copyright law, the widespread use of functional or

---

748 F.2d 653, 658 (Fed. Cir. 1984) ("*British law being different from our own*, and British and United States courts being independent of each other, resolution of the question of whether the United States patents are valid could have no binding effect on the British court's decision."). And as noted above, under governing Ninth Circuit law "local and foreign issues" may be "functionally the same" for purposes of an anti-suit injunction "even though the foreign action asserted claims under a foreign statute."  *Applied Medical*, 587 F.3d at 918.

MEMO. ISO *EX PARTE* APP. FOR TRO
CASE NO. CV 11-2959 EJD

1    stock game elements for common genres—e.g., tables, customers, chefs and cookbooks in "café"

2    games;  cities with streets and plots of land and hamburgers atop fast-food outlets in "city"

3    games—are unprotectable.  *See* Lemos Decl. ¶¶ 20-22.  The Copyright Act provides that "[i]n no

4    case does copyright protection for an original work of authorship extend to any idea, procedure,

5    process, system, method of operation, concept, principle, or discovery, regardless of the form in

6    which it is described, explained, illustrated, or embodied in such work."  17 U.S.C. § 102(b).

7    "[S]oftware copyright protection does not apply to functionality."  *Amaretto Ranch Breedables v.*

8    *Ozimals, Inc.*, No. C-10-05696, 2010 WL 5387774, at *2 (N.D.Cal. Dec. 21, 2010).  As the Ninth

9    Circuit has held, under the scènes à faire doctrine, "when similar features in a videogame are 'as a

10    practical matter indispensable, or at least standard, in the treatment of a given [idea],' they are

11    treated like ideas and are therefore not protected by copyright."  *Apple Computer Inc. v. Microsoft*

12    *Corp.*, 35 F.3d 1435, 1444 (9th Cir. 1994).

13        Similarly, the Brazilian copyright statute, Article 8, provides that "ideas, normative

14    procedures, systems, methods or mathematical projects or concepts as such" are "excluded from

15    copyright protection within the meaning of this Law."  Lemos Decl. ¶ 20.  Likewise, the Brazilian

16    software law, Article 6, provides that "the similarity of the program with another, preexisting

17    program, when this occurs by virtues of the functional characteristics of its application,

18    compliance with normative and technical precepts, or alternative limitations on its expressions"

19    shall "not constitute offense to the rights of the software program title-holder."  *Id.* ¶ 20.  In

20    another case by the São Paulo Court of Appeals, the court held that a TV program did not satisfy

21    the requisites of "novelty and originality," and could not be "considered an intellectual work

22    deserving protection, especially in the domain of television, where the free competition leads to

23    the creation of various segments, many of them similar."  *Id.* ¶ 22.

24        Zynga has conceded as much by drafting its Brazilian complaint as a virtual answer to

25    Vostu's counterclaim in this Court on the scènes à faire doctrine.  Zynga's primary contention in

26    its Brazilian complaint is that "Vostu did not merely copy ideas and concepts pertaining to the

27    genres of games . . . ., but also copied ZYNGA's actual forms of expression for those ideas, in

28    other words, the videogames themselves."  Luetdke Decl., Ex. J ¶ 7.  *See also id.* ¶¶ 8, 30 ("this

-19-

1    copy goes beyond the similarities of game styles and themes it not only copied the ideas, but also

2    the manner these ideas were executed"); *id.* ¶ 32 ("It is important to reiterate that this is not a

3    mere copying of ideas. Vostu copied and plagiarized the same expression of the ZYNGA video

4    gaming in blatant unfair competition."); *id.* ¶ 53 ("The Copyright Law - Law 9.610/98 - broadly

5    protects intellectual creations, "expressed by any means or fixed in any medium, tangible or

6    intangible, whether known or invented in the future." (Art. 7, heading). Exclusivity does not rest

7    on the idea, but on its "form'"); *id.* ¶ 55 ("In this sense, which is protected by copyright is not the

8    idea, but the expression."); *see also id*. ¶¶ 12, 49 (referencing the "scenes a faire" doctrine).[7]

9         Finally, the relief Zynga seeks in this Court is virtually the same as that which it seeks in

10   the Brazilian court.  In this action, Zynga seeks an injunction preventing Vostu from "[u]sing,

11   displaying, exhibiting, reproducing, distributing, selling or offering for sale any product or service

12   featuring any reproduction or copy of Zynga's Copyrighted Works, including but not limited to

13   the Infringing Works," Compl. at 21, defined as "MegaCity, Café Mania, Pet Mania, Vostu Poker

14   and MiniFazenda."  In Brazil, Zynga similarly seeks an injunction forcing Vostu "to immediately

15   cease any use, viewing, editing, reproduction, distribution, sale, offer for sale, serving, or

16   providing of the video games VOSTU MEGA CITY, VOSTU CAFE MANIA, VOSTU PET and

17   VOSTU POKER MANIA for any purpose . . . ."  Luedtke Decl., Ex. J ¶ 79(i)(a).  Vostu hosts its

18   game servers on Amazon servers that are located in the United States.  *See* Kafie Decl. ¶ 8.

19   Zynga also seeks monetary damages in both actions for the alleged infringement.

20        Accordingly, the issues between this action and the Brazilian action are the same, and this

21   Court's resolution of Zynga's claims will be dispositive of the Brazilian action.

22

23

24   ───────────────

     [7] Zynga's Brazilian complaint also asserts an "unfair competition" claim, but that claim is entirely
25   derivative of its copyright infringement claim.  Lemos Decl. ¶¶ 23-24.  *See also* Luedtke Decl.,
     Ex. J ¶ 64 ("'for a company to make an almost literal copy of four games from its direct
26   competitor for the same platforms used by the same consumers is somewhat surprising.' The
     technical conclusion confirms the unmistakable form of unfair competition").  Accordingly, this
27   Court's resolution of the copyright issues in this case will resolve not only the Brazilian
     infringement claim, but also the unfair competition claim.  Lemos Decl. ¶¶ 23-24
28

MEMO. ISO *EX PARTE* APP. FOR TRO
CASE NO. CV 11-2959 EJD

**B.      The Continuation of the Brazilian Litigation Frustrates This Court's Jurisdiction.**

The second requirement for an anti-suit injunction is that the foreign litigation must "frustrate a policy of the forum issuing the injunction."  *Applied Medical*, 587 F.3d at 913 (quoting *Gallo*, 446 F.2d at 991, 994).  In this case, permitting the Brazilian litigation to go forward would countenance Zynga's abuses of the judicial process, in contravention of federal policies against forum shopping, which are designed to prevent precisely the "inconvenience, inconsistency, and … race to judgment" that Zynga's simultaneous and cynical pursuit of litigation in multiple international forums would entail.  *Ibeto Petrochemical Indus. Ltd. v. M/T Beffen*, 475 F.3d 56 (2d Cir. 2007); *see also Stolt Tankers BV v. Allianz Seguros, S.A.*, No. 11 Civ. 2331, 2011 WL 2436662, at *5 (S.D.N.Y. June 16, 2011) ("the equitable considerations involved, such as deterring forum shopping, also compel enjoining the foreign action.").

Here, Zynga itself purposefully and originally invoked the jurisdiction of this Court to resolve its copyright disputes.  After testing the waters here, it was met with a vigorous defense and was slapped with a powerful counterclaim for declaratory relief that exposed the ultimate frailty of Zynga's specious claims and examples in support of them.  Rather than stand behind the complaint it filed in this Court, Zynga instead repackaged its claims and proceeded to a forum where it was able to obtain an enterprise-threatening injunction without notice to its adversary. Zynga did this even though—and almost certainly *because*—Vostu had fought back in this Court on the very issues that Zynga sought to resolve secretly and without any Vostu participation in the Brazilian forum.

Federal policy disfavors this sort of manipulation of the judicial process and authorizes injunctions to restrain those who engage in such gamesmanship.  For example, in *Gallo*, where the plaintiff had agreed to resolve disputes in the California courts but had instead invoked the more truncated procedures of an Ecuadoran forum, the Ninth Circuit issued an anti-suit injunction, holding that the plaintiff's "potentially fraudulent conduct and procedural machinations" in the foreign venue were contrary to federal policy and warranted relief.  446 F.3d at 993.  Similarly, the Second Circuit recently affirmed an anti-suit injunction issued by the

1   district court on the ground that such relief was necessary to "deter[] forum shopping," as well as

2   to minimize the risk that a second-filed lawsuit in Nigeria "would result in inconvenience,

3   inconsistency, and a possible race to judgment." *Ibeto Petrochemical Indus., Ltd. v. M/T Beffern*,

4   412 F. Supp. 2d 285, 293, *aff'd*, 475 F.3d at 65-66; *see also Stolt Tankers*, 2011 WL 2436662, at

5   *5 (citing "forum shopping," the "considerable inconvenience in shuttling witnesses between the

6   venues for these two actions," the fact that "outcomes could be inconsistent," and that "witnesses

7   and evidence in both actions would likely be the same," as reasons why injunctive relief was

8   warranted to prevent the plaintiff "to pursue parallel litigation in Brazil while arbitrating the same

9   issues in New York"); *cf. Attwood v. Mendocino Coast Dist. Hosp.*, 886 F.2d 241, 245 (9th Cir.

10  1989) (holding that "we do not encourage forum-shopping" and that "forum-shopping is an

11  appropriate factor to consider in deciding whether to invoke Colorado River" in the context of

12  requests to enjoin state-court proceedings).

13       **C.     The Impact on "Comity" Between the U.S. and Brazil Is "Tolerable."**

14       The third requirement for an anti-suit injunction is that the impact on comity between the

15  two jurisdictions must be "tolerable." *Gallo*, 446 F.2d at 994; *see Applied Medical*, 587 F.3d at

16  919-20 (concluding that anti-suit injunction "would not have an intolerable impact on comity").

17  While the Court must consider interests of comity, the Court is not required "to genuflect before a

18  vague and omnipotent notion of comity every time that it must decide whether to enjoin a foreign

19  action." *Gallo*, 446 F.2d at 995 (quoting *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 627 (5th Cir.

20  1996)).  The impact of an anti-suit injunction on comity interests here is minimal to non-existent.

21  In no way can it be described as "intolerable."

22       First, comity interests are greatest in disputes over a "public international issue," *Gallo*,

23  446 F.3d at 994, or where a foreign government is party to the litigation, *see Applied Medical*,

24  587 F.3d at 921.  That is not the case here.  The dispute between Zynga and Vostu is a

25  commercial dispute between private companies, nothing more.

26       Second, it shows no lack of "comity" to the courts of Brazil to rein in Zynga's abuses of

27  judicial process.  Zynga is not a citizen of Brazil.  Zynga is headquartered here, in the Northern

28  District, and this is where it chose to sue Vostu.  It was only after Vostu filed its counterclaim in

MEMO. ISO *EX PARTE* APP. FOR TRO
CASE NO. CV 11-2959 EJD

this District—and effectively called out Zynga's bluster by demonstrating that Zynga is suing for infringement of elements that Zynga does not own—that Zynga decided to go to a different jurisdiction, where the court did not afford Vostu a chance to be heard before a decision. Zynga's pursuit of the same claims in two different forums shows disrespect to *both* jurisdictions. An injunction against Zynga to curb these abuses shows respect, not disrespect, for Brazilian courts. *See Gallo*, 446 F.3d at 989 ("The injunction operates *in personam*: the American court enjoins the claimant, not the foreign court.").

Third, any impact on comity is considered to be minimal where the pursuit of litigation abroad would be "vexatious or oppressive." *Seattle Totems Hockey Club, Inc. v. Nat'l Hockey League*, 652 F.2d 852, 855 (9th Cir. 1981) (quoting *In re Unterweser Reederi Gmbh*, 428 F.2d 888 (5th Cir. 1970)). That is an apt description of what has happened here. Notwithstanding the pendency of Vostu's detailed counterclaim in this Court, Zynga went into court in another jurisdiction, and secretly sought and obtained a preliminary injunction, without an injunction bond, that threatens devastating effect to Vostu. If Zynga believed that it was being irreparably harmed by the same purportedly unlawful conduct (adjudged under the same standards)—namely, alleged infringement by Vostu occurring through computer servers located in the United States—Zynga could and should have sought a preliminary injunction in accordance with the Federal Rules. Doing so would have required strict compliance with due process, *i.e.*, notice to Vostu and an opportunity to be heard and to rebut Zynga's charges, as Vostu demonstrated it was ready, willing and able to do with its counterclaim and its efforts to engage in expedited discovery prior to the injunction. *See* Luedtke Decl. ¶¶ 9-14 & Exs. F-H. Zynga instead opted for a procedure that was likely to (and in fact did) deprive Vostu of the opportunity to be heard and to respond to Zynga's claims before an injunction was issued. All this weighs in favor of enjoining Zynga from continuing this oppressive litigation campaign. *See Gallo*, 446 F.3d 987-88 (enjoining foreign suit where party was received notice of foreign suit the day before evidence was to be presented); *Applied Medical*, 587 F.3d at 921 (enjoining foreign suit where same claims were "already being litigated in the district court").

Fourth, and related, litigation in Brazil would involve both "expense and vexation"

MEMO. ISO *EX PARTE* APP. FOR TRO
CASE NO. CV 11-2959 EJD

1    because of the "substantial inconvenience and expense to the parties and witnesses" of having to

2    litigate there.  *Seattle Totems*, 652 F.2d at 856 (quoting *Bethell v. Peace*, 441 F.2d 495, 498 (5th

3    Cir. 1971)).  The central issue in both cases is whether Zynga can enforce copyright in protectable

4    elements of its games against Vostu.  An inquiry into whether Zynga's claimed copyrights

5    involve material original to Zynga will involve an examination of Zynga's game development.

6    Zynga's witnesses are mainly if not exclusively located in the Northern District of California, not

7    in Brazil.  A great many witnesses on both sides of this dispute would not even be able to speak

8    the language of the foreign forum (Portuguese).

9          Zynga's flight to Brazil is nothing more than a cynical attempt "to evade the rightful

10   authority of the forum court" that it chose, and where Vostu had already fully joined issue by

11   filing counterclaims with respect to the very same games that Zynga now challenges in Brazil.

12   *Gallo*, 446 F.3d at 995 (quoting *Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren*,

13   361 F.3d 11, 20 (1st Cir. 2004)).  Under these circumstances, "the need for an anti-suit injunction

14   crests."  *Id.* (quoting *Quaak*, 361 F.3d at 20).  This Court has "a duty to protect [its] legitimately

15   conferred jurisdiction to the extent necessary to provide full justice to litigants."  *Id.* (quoting

16   *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 927 (D.C. Cir. 1984)).

17   There is no injustice or offense to comity of requiring Zynga to finish the battle where Zynga

18   decided to start it and where Vostu vigorously joined it.  All three requirements for an anti-suit

19   injunction are satisfied, and the Court should issue that injunction promptly.

20   **IV.    THE BOND FOR THIS ORDER SHOULD BE MINIMAL OR THERE SHOULD
21          BE NO BOND REQUIRED AT ALL.**

22         As required by Federal Rule of Civil Procedure 65(c), the party seeking a preliminary

23   injunction must post security to cover the "costs and damages as may be incurred or suffered by

24   any party who is found to have been wrongfully enjoined or restrained."  Fed. R. Civ. Proc. 65(c).

25   The amount of the bond "will generally be what the court deems sufficient to cover losses and

26   damages incurred or suffered by the party enjoined if it turns out that the injunction should not

27   have been granted."  *AT&T Commc'ns of Cal. v. Pac. Bell*, No. C 96-1691, 1996 WL 940836, at

28   *11 (N.D. Cal. July 3, 1996).   The bond here should be minimal, or there should be no bond

required at all.  Zynga is not in danger of losing anything by proceeding in this Court, and not in Brazil.  Indeed, proceeding in this Court is precisely what Zynga itself chose to do in the first place.

**V.      CONCLUSION**

For the foregoing reasons, Vostu respectfully requests that the Court grant the requested TRO; enjoin Zynga from continuing to prosecute the Brazilian action; and require it to halt any further pursuit of its injunction request in that country while this Court is considering whether to grant an anti-suit injunction on the motion for preliminary injunction.  Vostu further requests that this Court set this matter down for briefing on a preliminary injunction against Zynga's prosecution of the Brazilian action.

DATED: August 8, 2011                          MUNGER, TOLLES & OLSON LLP
                                               WINSTON & STRAWN LLP


                                               By:_____/s/_____
                                                  Kelly M. Klaus
                                                  MUNGER, TOLLES & OLSON LLP
                                                  Attorneys for Defendants
                                                  VOSTU USA, INC., VOSTU LLC and
                                                  VOSTU LTD.